## SHACKELFORD v. FULTON.

(Circuit Court of Appeals, Fourth Circuit.   May 26, 1905.)

No. 560.

CONTRACTS—CONSTRUCTION—ADDITIONAL TERMS.

Where a contract for the sale of coal lands provided that the parties agreed to sell and convey, or cause to be conveyed, "the coal in and under the tracts of land hereinafter described and referred to and as stated in the contract of sale, options and deeds hereinafter named," and one of the options did not specify any particular kind of coal, but during an interval which elapsed between the date the contract was signed and the date of the payment, by which the option was converted into an absolute contract to purchase, plaintiff had an opportunity to learn the nature of the option and investigate the existence of and character of the coal underlying the land, he was not entitled to reject such option on the ground that the coal underlying the land referred to therein was not of the kind intended to be purchased.

In Error to the Circuit Court of the United States for the Northern District of West Virginia, at Parkersburg.

W. E. R. Byrne (Robert F. Kidd and Linn, Byrne & Caton, on the brief), for plaintiff in error.

W. E. Haymond (Reese Blizzard, on the brief), for defendant in error.

Before GOFF and PRITCHARD, Circuit Judges, and McDOWELL, District Judge.

McDOWELL, District Judge.   This was an action of trespass on the case in assumpsit, brought by Fulton, defendant in error, against Shackelford, plaintiff in error, in which judgment was rendered in favor of the plaintiff below.   Shackelford, and certain associates who subsequently assigned their interests to Shackelford, having acquired deeds to three tracts of coal land, contracts of sale and purchase for some seven tracts, and "options" for some 36 other tracts, entered into a contract which reads, so far as now material, as follows:

"This contract made and entered into this, the 15th day of February, 1901, between J. N. Shackelford, Lloyd Rinehart and C. M. Bennett, of Gilmer county, West Virginia, parties of the first part, and E. D. Fulton and J. W. Emery, of Pennsylvania, parties of the second part,

"Witnesseth: That for and in consideration of the sum of twenty-two and 50/100 dollars per acre, to be paid as follows: ($600.00) six hundred dollars in hand paid, and twenty-five hundred dollars ($2,500.00) to be paid before the 1st day of March, 1901, and the residue to be paid as soon thereafter as each tract of land hereinafter named and referred to can be surveyed and abstract of title made showing good title vested in the land owner to the land, the said parties of the first part agrees to sell and convey or cause to be conveyed to the parties of the second part, or to whom they may direct, the coal in and under the tracts of land hereinafter described and referred to and as stated in the contracts of sale, options and deeds hereinafter named, subject to all the provisions herein contained, that is to say:   *   *   *

"An option executed by Emery Gough to J. N. Shackelford, dated December 31, 1900, for about 130 acres.   *   *   *   [Here follows a list of many options, of the absolute contracts and of the tracts which had been conveyed.]

"An option executed by J. S. Brannon to J. N. Shackelford, dated Jany. 4,

139 F.—7

1901, for 300 acres; * * * containing in the aggregate about 5,000 acres to be ascertained by actual survey, situate in Gilmer county, W. Va."

"All such mining rights and privileges are to be conveyed as may be now or hereafter vested in said first parties.

"It is expressly understood between the parties hereto that all the coal in and under the tracts of land listed above as held by first parties under contracts of sale and purchased by deeds shall be paid for in full to first parties by second parties on or before April 15th, 1901.

"If the parties of the first part are unable to procure a good and sufficient deed, together with full mining rights because of some incurable defect in the title, they shall not be held liable for any such failure to convey in such case; each tract for which there is a good title is to be settled for independent of any other tract.

"It is further understood and agreed that the parties of the second part are to furnish sufficient money to pay for the tracts above referred to when deeds are ready to be delivered, said second parties agreeing to take title direct from the land-owner and any failure of the parties of the second part to furnish the money to pay for each tract as herein provided for shall relieve the parties of the first part from any and all liability to the parties of the second part on account of this contract.

"The parties of the first part are to have said coal surveyed and titles abstracted and to pay for the same.

"It is understood and agreed that if the second parties shall mail a New York draft or a certified check for the above-mentioned sum of twenty-five hundred dollars, payable to C. M. Bennett, at Glenville, W. Va., on or before said 1st day of March, 1901, that then this contract shall be and remain in full force and effect, otherwise said contract shall be null and void, and the $600.00 paid this day shall be forfeited to the said parties of the first part.

"Witness our hands and seals the day and year first above written."

Emery subsequently assigned his rights under this contract to Fulton.

The $600 was paid at the time of the execution of this contract, and the $2,500, which was to have been paid on or before March 1, 1901, was paid in due time. Thereafter, from time to time, Fulton made many payments, some to the original owners and some to Shackelford. The payments made to Shackelford were made irregularly, on general account, and finally Fulton came to believe he had overpaid Shackelford, and brought this action to recover this supposed overpayment. While there was at the time of the trial below some other matter in controversy, it seems now that every question of difference has been settled except whether or not Shackelford is entitled to have the profit on the Brannon option, which was allowed to lapse.

The contention of Fulton was that the contract of February 15, 1901, should be construed as requiring him to pay only for the number of acres of land underlaid by "Pittsburg" coal, and that there was no bed of coal of this variety under the Brannon tract. Shackelford's contention was that the Brannon tract was underlaid by one or possibly more beds of other kinds of coal of at least prospective value, and that under the contract he was entitled to his profit if there was any coal of present or prospective value under the Brannon tract.

Counsel for Shackelford requested that the following instructions be given:

"No. 1. The court instructs the jury that by the terms of the contract of February 15, 1901, between J. N. Shackelford and others, of the first part,

and E. D. Fulton and J. W. Emery, of the second part, read in evidence, the parties of the second part, if they elected to avail themselves of its benefits, were required to take the coal therein mentioned, described in the contracts therein referred to, in accordance with the terms of said contracts; and if the jury believe from the evidence that the option from J. S. Brannon referred to in said contract provided for a sale of all the coal within and underlying the tract to which it related, without reference to any particular strata of coal, and that there is within and underlying the same coal of present or prospective value, then the said Fulton and Emery, or the said Fulton, as assignee of the said Emery, would be bound to take and pay for the same as provided for by said contract.

"No. 2. The court instructs the jury that if they believe from the evidence that the contract of February 15, 1901, read in evidence, related to what is called the 'Shackelford Coal Field,' and embraced some coal of superior quality which could have been readily sold at a much higher price than that of $22.50 per acre, named in the contract, other coal which would be termed good, and still other coal of an inferior quality, and that it was all considered, sold, and purchased as a whole, at an average price of $22.50 per acre, after an opportunity of inspection, then the purchasers, Fulton and Emery, or E. D. Fulton, the assignee of said Emery, would be bound to take all of said coal, and would not be allowed to take the best and reject the inferior grade."

The court refused to give these instructions, and charged the jury, in so far as is now material, as follows:

"The contract in this case is a contract for the entire block, comprising all the farms that were within that block, at $22.50 per acre. There is no provision in the contract by which Fulton reserves the right of electing to determine whether any one of the farms comprising this block should be rejected. It follows, therefore, as a proposition of law, that the contract must be treated as an entirety. The contract sells this entire boundary, composed of these tracts. Now, of course, if Shackelford and his associates cannot deliver that entire boundary, or if there was any failure to title, or failure of possession to the land, by which the plaintiff in this action could not get possession of it, then, of course, he would be entitled to an abatement upon the contract price to the extent of that failure. I repeat, now, that the contract is an entirety, and it had sold this whole boundary, comprised, as I have said, of these various tracts of land, 46, I believe, in number. Each one of these tracts of land had to be surveyed, the title examined, and a plat made of it. Now, that seems to have been done, and Fulton cannot complain that it was not done, because he acquiesced in the action of the defendants in this case, and went on and paid very large sums of money until he came to the Brannon tract.

"Now, the whole question involved in this Brannon tract is whether or not there is coal there. If in the Brannon tract there is no coal—such coal as they were negotiating for—then the equitable side of this case would be that the plaintiff had a right to reject that; or, in other words, he would have a right to recover back any money that he paid for it, if such is the fact. And why? Because the contract says that it was for the purchase of coal. Why, further? Because the contract is silent as to the character of the coal they were purchasing; but the evidence is, with reference to all these contracts that were being made up in that country—as a general thing, or with very few exceptions—that they were for Pittsburg coal. This contract was silent as to the character of the coal, and that is just why these gentlemen got into litigation. They think that they can do all that lawyers can, in that country up there, and, instead of going and paying a lawyer fifteen or twenty dollars to draw a contract, they draw it themselves and get into trouble. If a lawyer did draw this contract, he certainly was very loose in drawing it; that is, on that question.

"I repeat, then, that the contract is silent as to the character of coal. Being silent as to that, and the claim of the plaintiff here being that it was for Pittsburg coal, while the claim of the defendant is that there was no coal mentioned, and that the plaintiff was bound to take any coal found there, that is a matter that you will have to determine from the facts and circumstances in this case. The evidence is before you. It is not for me to fix that matter

for you. If you find from the evidence in this case that these negotiations were based upon the fact that Pittsburg coal was underlying that tract of land, then the plaintiff would be entitled to have Pittsburg coal, although the contract did not so specify. It simply specifies coal. Now, then, upon what principle? Upon the principle, if no other, that here was a fair cash valuation being paid for the block of land; and it would be inferred, and rightly inferred, that where there was a fair cash valuation being paid, that they were selling, and that the purchaser was getting, what was understood to be coal lands of a certain character. Now, the whole controversy in this case is upon that question of whether there is coal under this land. Now, you are to determine that from the evidence you have had before you. If you find from the evidence that there was coal under this land, and coal that was merchantable and marketable, I think the plaintiff, as to the Brannon land, ought not to recover, because he bought this tract in a lump, and he must take it as he found it; but if you find from the evidence in this case that there was no coal upon that land of a merchantable character, then I think the plaintiff would be entitled to recover any money that he had paid in consideration of this tract of land."

Exceptions were duly taken, and the refusal of the court to instruct as requested, and the giving of the charge in part as given, are assigned as error.

The evidence tended to show that there was no Pittsburg coal under the Brannon tract. There was evidence tending to show that there were two other beds of coal at a considerable depth below water level under the land, which might have some prospective value. From the testimony it appears that the majority of the options and other contracts taken by Shackelford specified that the vendee was to take and pay for only the number of acres of land believed to be underlaid by the Pittsburg bed of coal. They also provided that, where it appeared from the location of the outcrop that the Pittsburg bed was under only a part of the tract of land, the acreage to be conveyed and paid for was only that underlaid by said bed of coal. The Brannon option had been lost prior to the trial, and, without objection, secondary evidence of its contents was introduced. The only witnesses on this point were Brannon, who executed the option, and Shackelford, the vendee. Both these witnesses stated that the word "Pittsburg" was not in the option; that the provision for a survey according to the outcrop line was stricken out; and that the paper was merely an agreement to sell the coal on and under the Brannon tract, with mining rights, the survey to be based on the boundaries of the vendor's land.

The only question which we find it necessary to consider is the propriety of the action of the learned trial judge in charging the jury, in effect, that they might find for the plaintiff if they believed that the plaintiff had bargained only for Pittsburg coal. By the contract of February 15, 1901, the first parties agreed to sell and convey, or cause to be conveyed, "the coal in and under the tracts of land hereinafter described and referred to and as stated in the contracts of sale, options and deeds hereinafter named." Under this provision it seems to us that the question raised by this writ of error was solvable only by the terms of the Brannon option. As that paper did not specify Pittsburg coal, we think the charge given below was erroneous, in that the jury were told that they might find in favor of the plaintiff if they believed that the parties to the action

contracted only as to Pittsburg coal. It seems probable that Fulton did not, at the time the agreement of February 15, 1901, was signed, know the contents of the Brannon option. But during the interval between that date and the time of the payment which converted this agreement from an option into an absolute contract of purchase, he had opportunity to learn the nature of the Brannon option, and to investigate the question as to the existence of the Pittsburg coal under the Brannon land. Under the terms of the Brannon option Fulton was not at liberty to refuse to pay Shackelford merely because the Pittsburg bed did not underlie the Brannon tract.

We are of opinion to reverse and remand this cause for further proceedings not inconsistent with this opinion.

Reversed.